Titone, J.
(dissenting). While the judicial construction of legislative enactments includes consideration of their "spirit and purpose” and " 'legislative intent is the great and controlling principle’ ” (Ferres v City of New Rochelle, 68 NY2d 446, 451), courts are not free to supplement statutory language with additional, judicially conceived requirements. Since that is precisely what the majority has done in this case and since, in my view, such judicial augmentation is not necessary for the rational implementation of the statutory scheme as it is written, I respectfully dissent.
As the majority acknowledges, the language in the statute at issue here is unambiguous. Locally issued variances affecting land use within the designated Adirondack Park area "shall not take effect for thirty days after the granting thereof’ and "[i]f, within such thirty day period, the [Adirondack Park Agency (APA)] determines that such variance * * * was not based upon the appropriate statutory basis of practical difficulties or unnecessary hardships, the agency may reverse the local determination” (Executive Law § 808 [3] [emphasis supplied]).
The 30-day period in which the APA must act is thus not left undefined; rather, it is specifically made coextensive with the 30-day period during which the granted variance remains ineffective. Indeed, the Legislature’s use of the term "such thirty day period” demonstrates a deliberate choice to use the same time span for determining the period within which both *424 events must occur (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 254, at 418 ["the word ’such,’ when used in a statute, must, in order to be intelligible, refer to some antecedent, and will generally be construed to refer to the last antecedent in the context”]). Accordingly, the "ambiguity” that ordinarily justifies a judicial construction supplementing or filling in the interstices of a legislative enactment is not present here.
Moreover, the court’s own view of what method would best implement the underlying statutory policies cannot be cited as an alternative justification. ”[R]ules of construction are invoked only when the language used leaves [the statutory] purpose and intent uncertain or questionable^] [t]hey cannot be resorted to for the purpose of enabling the courts to enlarge or extend the legislative design or intent.” (People ex rel. New York Cent. & Hudson Riv. R. R. Co. v Woodbury, 208 NY 421, 425; accord, Eaton v New York City Conciliation & Appeals Bd., 56 NY2d 340.) ”[T]o interpret a statute where there is no need for interpretation, to conjecture about or add to * * * words having a definite meaning * * * are trespasses by a court upon the legislative domain” (McKinney’s Statutes § 76, at 168). This is especially so where, as here, the judicially chosen method conflicts with the explicit legislative design.
The rules of construction mandating avoidance of absurd consequences and frustration of legislative purpose also cannot fairly be invoked here. It is true, as the majority observes, that the most natural reading of the statute as drafted could result in the impairment of meaningful agency review where a locality fails, by design or neglect, to notify the APA of a variance grant. However, such impairment is, at most, a mere weakness in the legislative design; it is certainly not the sort of "absurd consequence” or complete frustration of the legislative goal that is typically cited as a ground for judicial redrafting. Indeed, the problem the majority perceives may well be illusory, since the APA’s statutory authority can easily be construed as entitling it to "reverse” a local variance grant as "not based upon * * * practical difficulties or unnecessary hardships” (Executive Law § 808 [3]) in cases where the absence of an adequate record prevents it from concluding otherwise.*
*425 Further, there is no sound reason to assume that the legislative "gap” the majority perceives and rushes to fill was unintentional. The Legislature has itself provided for mandatory written notice to the agency and the provision of necessary "pertinent information” "[u]pon receipt of an application for a variance” (Executive Law §808 [3]). Since the Legislature made explicit provision for notice at the initiation, but not the conclusion, of the local variance application process, it seems probable that the Legislature meant to create a system in which the APA, once having been notified of a particular application, would assume the responsibility of monitoring its progress. Such monitoring would ensure that an approval would not slip by unnoticed, even if the locality did not provide the APA with timely formal notice. Indeed, the absence of any legislative requirement that such postgrant formal notice be provided at all militates against a construction that relies on such notice as an event triggering the running of the agency’s deadline.
Moreover, the Legislature has provided a vehicle for addressing any concerns the APA may have about the inclination of a specific locality to cooperate with that agency’s State-level review of variance grants. The "variance grants” to be reviewed under Executive Law §808 (3) are variances from "approved local land use program[s]” (emphasis supplied). Such programs must be "approved” by the APA and "administered and enforced as provided for” (Executive Law § 808 [1]; see, §807). Thus, to the extent that there is concern about prompt notification to facilitate APA review, the matter can readily be resolved, within the express legislative design, by inclusion of appropriate regulations in the "local land use program” itself.
Finally, by superimposing a solution of its own devising, the majority has opened up several new anomalies and problems which will, no doubt, require further judicial tinkering in the future. For example, although the majority has squarely held that the 30-day period for the APA to act commences to run "on the receipt by the APA of notice of [the] variance grant, along with necessary materials promptly and reasonably requested by the APA” (majority opn, at 423), its opinion leaves unclear whether the same rule is to apply to the running of the 30-day waiting period during which the variance grant remains "ineffective” under Executive Law § 808 (3). Presumably, the time periods for these two occurrences must be *426 coextensive, since there would otherwise exist a period of "limbo” for the property owner during which its variance would be legally "effective” but would remain subject to reversal by the State administrative agency.
Regardless of its ultimate resolution of the above-mentioned question, the majority’s holding has paved the way for a whole new class of litigation to resolve what constitutes a "prompt” and "reasonable” agency request for "material” that is "necessary” and "pertinent to meaningful review.” Such a result is particularly objectionable in this context, since it will lead to a degree of uncertainty that is unacceptable in the area of land use decisions. Landowners who have succeeded in obtaining variances from local governments will be required either to comply indefinitely with the APA’s requests for further information or to commence article 78 proceedings to compel the agency to decide the matter before it on the basis of the information it already has. The courts will then have to determine, on a case-by-case basis, whether the additional agency request was "reasonable” and, if not, when the agency’s time for taking action, in fact, began to run. This is an unrealistic and overly burdensome approach to the problem of assuring "meaningful” APA review.
The majority’s interpretation of Executive Law § 808 (3) also gives the APA, anomalously, more discretion to delay in the approval of individual variances from local land use programs than it has in the far more environmentally significant area of approving class A and B regional projects. The agency’s discretion to request additional information in the latter area, which is governed by Executive Law § 809, is limited by the detailed rules and deadlines set forth in that section. Executive Law § 809 (2) (b), for example, provides that "[o]n or before fifteen calendar days after the receipt of [an] application” the agency must notify the project sponsor whether it deems the application complete. If additional information is needed, the statute provides that "[t]he submission * * * of the requested additional information shall commence a new fifteen calendar day period for agency review * * * for the purposes of determining completeness” (id.). On the other hand, if the agency fails to mail a notice of incompleteness within 15 days of its receipt of the application, "the application shall be deemed complete” (id; see also, Executive Law § 809 [6] [c] [agency request for additional information during *427 review of application by permit holder for renewal or modification "shall not extend any time period for agency action contained in this section”]).
The existence of such detailed rules governing the postponement of the deadlines for the agency to act under Executive Law § 809 when it perceives a need for more information suggests to me that the omission of similar provisions in Executive Law § 808 (3) was not a mere legislative oversight. Furthermore, the minutely detailed provisions in Executive Law § 809 suggest that if there are to be such postponements under section 808 (3), they ought to be governed by legislatively designed rules, and not by such imprecise standards as the "reasonableness” or "promptness” tests the majority has devised.
There is no dispute that the goal of the APA Act to "preserv[e] the priceless Adirondack Park through a comprehensive land use and development plan” and the legislatively chosen method of accomplishing that goal by "preventing] localities within the Adirondack Park from freely exercising their zoning and planning powers” (Wambat Realty Corp. v State of New York, 41 NY2d 490, 494-495; see, majority opn, at 421) are both laudable and deserving of judicial support. The precise issue presented here, however, is not whether the Legislature’s goals are to be advanced as a general matter, but rather whether the Legislature has established procedures for handling variance applications that are workable and sufficiently clear to permit their implementation. Since I conclude that it has, I cannot concur in my colleagues’ analysis. If, upon further review, the Legislature deems its own scheme to be as deficient as the majority believes, it remains free to make the necessary statutory alterations.
In sum, I would hold that the APA’s November 14th reversal of the Zoning Board of Appeals decision was untimely and was therefore ineffective. Accordingly, I vote to reverse the Appellate Division order and grant the petition.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander and Hancock, Jr., concur with Judge Bellacosa; Judge Titone dissents and votes to reverse in a separate opinion.
Order affirmed, with costs.

 Apparently, that is precisely what the APA did in this case when on July 19th it reversed the local Zoning Board of Appeals initial decision on the ground that a complete record of the evidence had not been provided.